UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

Isabel Manzo,

              Plaintiff                08-CV-1229

   -against-                     MEMORANDUM
                                        OPINION
                                        AND ORDER

Sovereign Motor Cars, Ltd.,
Edward Feldman, and Jack Matalon,

              Defendants.

------------------------------------X
SIFTON, Senior Judge.

On March 21, 2008, plaintiff Isabel Manzo filed a complaint
against Sovereign Motor Cars, Ltd. ("SMC"), Edward Feldman and
Jack Matalon, alleging (1) denial of overtime compensation, in
violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§
201 *et seq.*; (2) denial of overtime compensation, in violation of
New York Labor Law ("NYLL") §§ 663-66; (3) denial of earned
commissions and bonuses in violation of Article 190 of the NYLL;
(4) gender discrimination in violation of Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*
("Title VII"); (5) retaliation in violation of Title VII; (6)
gender discrimination in violation of the New York City Human
Rights Law ("NYCHRL"), New York City Administrative Code §§ 8-107
*et seq.*; (7) retaliation in violation of the NYCHRL, and (8)
sexual harassment in violation of the NYCHRL.  Plaintiff seeks
compensatory, economic, and punitive damages, as well as
declaratory and injunctive relief, and attorney's fees.

On July 6, 2007, plaintiff filed a charge of discrimination
with the Equal Employment Opportunity Commission ("EEOC"),

alleging discrimination based upon gender.  Plaintiff received her Notice of Right to Sue from the EEOC on February 1, 2008. She filed suit in this Court on March 21, 2008, less than ninety days from receipt of the Notice.  Defendants filed a motion to dismiss[1] on May 30, 2008, which on September 4, 2008 was denied in all respects excluding plaintiff's Title VII discrimination and retaliation claims against individual defendants, which plaintiff agreed to withdraw.

Presently before this Court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2] For the reasons that follow, defendants' motion is granted in part and denied in part.

## Background

The following facts are taken from the record of proceedings before the undersigned and from the Local Rule 56.1 statements,[3]

_____

[1] Defendants' May 30, 2008 motion to dismiss sought dismissal of all claims excluding plaintiff's claim for unpaid wages, commissions and bonuses pursuant to Article 190 of the NYLL.

[2] Plaintiff concedes an inability to prove her federal and New York State wage claims and withdraws those causes of action, comprising Counts I, II, and III of the Complaint.  Plaintiffs Opposition to Defendant's Motion to Dismiss, dated August 21, 2009 ("Plaintiff's Br.") at 3 n.1.  Accordingly, the below opinion does not discuss those claims.

[3] Defendants contend that plaintiff's Rule 56.1 statement and responses are deficient because they are (1) not concise; (2) proffer irrelevant information and information taken out of context; (3) contain no supporting evidentiary cites; (4) lack citations to admissible, accurate, or probative evidence; (5) proffer speculative or legal arguments; and (6) proffer newly asserted, conclusory allegations without proper bases and evidentiary cites.  Local Rule 56.1 directs that

(a) Upon any motion for summary judgment pursuant to Rule 56 of the

(continued...)

depositions, and affidavits submitted by the parties.  Disputes are noted.

Plaintiff, a resident of Brooklyn, New York, was recruited to SMC, a Mercedes Benz retailer, by defendant Matalon in February of 2007, when defendant Matalon saw plaintiff working at a local bank.[4]  Plaintiff was initially employed by SMC on February 26, 2007 as an Inventory Control Manager.

## *Plaintiff's Allegations of Inappropriate or Harassing Behavior*

Plaintiff alleges that throughout her tenure at SMC,

---

[3](...continued)
Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried
. . .
(c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party
. . .
(e) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

In considering a  motion for summary judgment, a district court "must determine whether a Rule 56.1 response does in actuality present a dispute that is genuine," bearing in mind questions of admissibility. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 314 (2d Cir 2008). As described *infra,* I have deemed admitted any Rule 56.1 statement as to which the opposition statement is not supported by admissible evidence. To assist in the determination of which factual issues are truly in dispute, plaintiffs statements should have been more concise.  However, I have not disregarded any statement on that ground.

[4]  Defendants refuse to admit plaintiff's Rule 56.1 statement regarding her initial contact with and recruitment by defendant Matalon, but declined to offer any counter-statement concerning those events.  Defendant Matalon's deposition testimony largely matches plaintiff's Rule 56.1 statement.  *See* Matalon Tr. 49-50.

defendant Matalon engaged in a "continuous and concerted campaign
of sexually harassing remarks and behavior." Plaintiff Br. at 2.
She alleges the first such incident occurred two days after she
commenced her employment, on the return trip from a business
conference that she had attended with defendant Matalon, at his
request.  Plaintiff contends that on the trip Matalon told
plaintiff that he and his wife did not have sex, that he felt
much younger than his wife, and "that he is looking for someone
else in his life to be with."  Plaintiff's Rule 56.1 statement ¶
72.[5]  He stated that he could not leave his wife because he
feared she might commit suicide, that he believed he and
plaintiff would "make a great team" and that he believed they
could "become great friends, go out and have a good time."  *Id.*

---

[5] Plaintiff's Rule 56.1 statement cites to, and attaches as an exhibit,
an unsworn electronic document containing a detailed record of events created
by plaintiff at or near the time several of the events transpired. Plaintiff
stated in her deposition that she created the document on May 7, 2007 during
the Houston trip, described *infra*, and updated it periodically thereafter.
Manzo Tr. 65:10-70:18.  The statements in the electronic document are
undoubtably hearsay.  However, were a proper foundation laid at trial, the
statements (but not the document itself) might be admissible pursuant to
pursuant to Fed. R. Evid. 803(5), permitting admission of the contents of "[a]
memorandum or record concerning a matter about which a witness once had
knowledge but now has insufficient recollection to enable the witness to
testify fully and accurately, shown to have been made or adopted by the
witness when the matter was fresh in the witness' memory and to reflect that
knowledge correctly.  *See Hudson v. Fischer,* No. 06-CV-1534, 2008 WL 5110974
(N.D.N.Y. Dec. 2, 2008) (supporting consideration on summary judgment motion
of 161 page handwritten "log book" in which Plaintiff recorded events
purportedly constituting hostile work environment); *but see Trinidad v. New
York City Dept. of Correction*, 423 F. Supp. 2d 151 (S.D.N.Y. 2006) ("Unsworn
material, such as the two handwritten synopses plaintiff testified she
prepared as general background for her attorney's review are inadmissible
hearsay that are an insufficient basis for opposing a motion for summary
judgment.")(citations omitted).  Because the document has not been sworn to, I
have not directly considered it as a basis for opposing defendants' motion for
summary judgment, but where plaintiff's Local Rule 56.1 statements cite to the
electronic document, I have deemed the statements supported by citation to
evidence which would be admissible.

After approximately one month of working at SMC, plaintiff complained to defendant Edward Feldman, Vice President of SMC, that she was dissatisfied with her position and pay as Inventory Control Manager and requested a transfer to work in the Fleet Department, of which defendant Jack Matalon was Manager. Defendant Feldman granted her request in March 2007. Plaintiff testified that although she was pleased with the transfer because the work would be more interesting and the pay better, her transfer to the Fleet Department was originally defendant Matalon's idea. She explained that Matalon had suggested plaintiff orchestrate the move by approaching defendant Feldman herself because Feldman "would not be happy with me moving so quickly after I just started. They would be very angry at Jack if they knew Jack was the one who was pushing for me to come over to his side. So he said it would have to be my idea." Deposition of Isabel Manzo at 72:8-10, 76:10-78:7).[6] In April 2007 plaintiff began working in defendant Matalon's department, and was given the job title of "Fleet Assistant."

Plaintiff contends that defendant Matalon continued to make unwanted overtures toward her following her transfer into the department he managed, and to threaten or take adverse action when she rebuffed his advances. She contends that:

---

[6] Defendant denies that the transfer to Matalon's department was Matalon's idea, but cites to evidence showing only that plaintiff requested the transfer, not that it wasn't at Matalon's urging. Rule 56.1 statement and response ¶¶ 7-8, 70.

- Defendant Matalon stated to defendant in a telephone call on Saturday evening of March 17, 2007 that he had done a lot of thinking and felt plaintiff was a very special girl in his life, asked if she would ever consider being with him, whether she would go away with him and whether she would ever marry a guy like him. Plaintiff's Rule 56.1 statement ¶ 75.

- On or about March 23, 2007, defendant Matalon approached plaintiff and asked her to go out with him either for dinner to to play racquetball. Two days later, after replying, in substance, that she was at SMC "to work and for nothing else," defendant Matalon responded by text message, telling plaintiff that he "had doubts about her successful employment at Sovereign. After plaintiff reiterated that she was not interested in going to dinner or participating in other activities with Matalon outside of work, he replied that he understood. However, shortly thereafter he asked plaintiff if she had any feelings for him and if there was "a chance" for them to be together. After plaintiff replied in the negative, he informed plaintiff that in the back of his mind he still felt "they could be more." Plaintiff's Rule 56.1 statement ¶ 76.

- On March 27 and 28 Matalon approached plaintiff at her desk and asked her to go out and get drinks. When plaintiff told

Matalon she was uninterested, Matalon informed plaintiff
that she was upsetting him, that he had done so many things
to help her, including getting her into his department, and
that he couldn't believe how unappreciative plaintiff was
being.  Plaintiff's Rule 56.1 statement ¶ 77.

• On repeated occasions during April 2007, defendant Matalon
asked plaintiff out for dinner or drinks, and in the context
of each such conversation told plaintiff about $1,500 in
bonus money that she would receive, explicitly linking his
romantic overtures with plaintiff's compensation.  When
plaintiff only received $1000 in bonus money on April 20,
defendant Matalon allegedly stated that he had decided to
deduct a portion of plaintiff's bonus money because
plaintiff was unappreciative "of everything that Matalon had
done for her." Plaintiff's Rule 56.1 statement ¶ 77-78.

Plaintiff claims that Matalon's harassment continued and
worsened during a business convention she attended with Matalon
in Houston, Texas.  According to plaintiff, prior to the trip,
defendant Matalon asked if he could book a single room for the
two of them to share.  After she replied in the negative, he
suggested as a compromise that he could book a suite with two
beds.  He also told plaintiff  that he was losing weight for
plaintiff so that he could look good sitting by the pool next to
her.  On the plane trip to Houston, he told plaintiff that she

was a wonderful girl, that he was intrigued by plaintiff, and that he wanted to have fun with plaintiff in Houston. At one point, during the plane ride, he allegedly grabbed plaintiff's and put it up to his face and tried to kiss it. Later during the plane ride, defendant Matalon allegedly said that if a tornado struck Houston it wouldn't be so bad because he and plaintiff could "stay in the hotel room the entire time watching movies and making out." Plaintiff's Rule 56.1 statement ¶ 82.

Upon their arrival in Houston, he asked plaintiff if she had brought clothing to wear while sitting by the pool, and offered to buy plaintiff something to wear.[7] After checking in, and while walking to their respective rooms, defendant Matalon told plaintiff that he could not fall asleep alone and needed plaintiff to tell him a bedtime story. That night, on the pretext of having misplaced his hotel room key and needing to use the phone in plaintiff's room to call for a new one, defendant Matalon entered plaintiff's room, took off his jacket, unbuttoned three or four buttons of his shirt, lay down on plaintiff's bed and stated that he couldn't sleep alone and needed to hear a bedtime story. He then patted the bed with his hand, and stated, in substance, "come over here, sit next to me, I need to tell you something." Manzo Tr. 227. Plaintiff refused to sit on the bed

---

[7] Plaintiff contends defendant Matalon offered to buy her a bikini or bathing suit. Plaintiff Tr. 220. Defendant Matalon recalled offering to buy plaintiff a pair of shorts. Matalon Tr. 205.

with defendant Matalon, and he left shortly thereafter.[8]

Plaintiff testified that later that night defendant invited her to accompany him for drinks at the hotel bar, and she agreed.[9]  The drinks lasted approximately 40 minutes, during which time plaintiff attempted to convey to defendant that she believed his conduct was "out of hand."  Manzo Tr. 238:7-15. Defendant Matalon allegedly stated, "I know we can't be anything more, you made that clear, let's just be friends," *id.,* but then a few minutes later asked plaintiff if she would marry him, and explained that while he has had "crushes" on other girls at the office, they had all died down, but he was having a harder time getting over his attraction to plaintiff.  Plaintiff's Rule 56.1 statement ¶ 87.

Following their return from Houston, plaintiff had an instant message conversation with defendant Matalon, on May 10,

---

[8] Defendants' version of the events differs markedly. While conceding that "while in Houston, Mr. Matalon's hotel room key did not work and plainitff allowed him into her hotel room . . . to use the phone to call the front desk for a new key," defendants' contend that defendant Matalon "sat on the corner of her bed . . . [and] during the three to five minute wait for the key to be delivered Matalon conversed with plaintiff; asked her to come closer when she could not hear what he was saying; and, as soon as the key was delivered he left and returned to his room."

[9] Plaintiff testified that she agreed to accompany defendant Matalon to drinks despite her unease at the events earlier that day because believed she needed to have a serious discussion with defendant concerning the fact that his repeated sexual overtures made her uncomfortable and were not requited. Manzo Tr. 235:17-236:3.  Defendants refuse to admit plaintiffs Rule 56.1 statement that, *inter alia*, defendant Matalon asked plaintiff to have a drink with him at the hotel, but cite solely to evidence that confirms that occurrence.  Defendant's Rule 56.1 statement ¶ 86, citing plaintiff's deposition at 235:21-236-2 and Matalon Deposition at 211:8-213:6.

2009.  The conversation included the following exchange:[10]


    [Plaintiff] so what was that whole, patting the bed and
asking me to come over there

    [Matalon] THAT was the only inapproprite [sic] thing.
Sorry.


Asked about the exchange in his deposition, defendant
Matalon testified that while in plaintiff's hotel room, he had
asked plaintiff to come closer to him because he wanted to make
sure she could hear him, and did not intend the gesture to have

---

[10] Plaintiff testified that she copied a transcript of the conversation
into the electronic document in which she had written notes concerning
defendant Matalon at or near the time the conversation took place.  The
relevant portion of the exchange reads:
    [Plaintiff]: you just upset me this whole trip to houston . . . you just
        said a lot of things and tried things that were not right . . .
        not appropriate.
    [Matalon]: name one pls
    [Plaintiff] you cant be serious
    [Matalon] just one
    [Plaintiff] your key not working, laying on the bed and patting it for
        me to come sit with you. . . [saying you] "can't fall asleep by
        myself, i need someone to tell me a bed time story"
    [Matalon] jthe key did not work im NOT lieing
    [Plaintiff] its not even about the key . . . you already know how I
        feel, we had these conversations before, it was just a little too
        much.
    [Matalon] i didnt think i bothered you really. Hopefully i can get yr
        respect back
    [Plaintiff] its just that you always say your [sic] joking, but when I
        "turn you down" no matter how its put, your attitude toward me
        changes a bit
    [Matalon] I don't and didn't expect anything from u. I booked 2 rooms ,
        I saw yr face and couldnt believe u would think i would be that
        sneaky
    [Plaintiff] so what was that whole, patting the bed and asking me to
        come over there
    [Matalon] THAT was the only inapproprite thing.  Sorry.

Exhibit 4 to Plaintiff's Rule 56.1 statement, at pp 9-10 (spelling and
capitalization as in original).

any sexual or romantic connotation.  He explained that when speaking to plaintiff afterwards, he apologized because he realized in retrospect that his actions were inappropriate because they could have been misinterpreted.  Matalon Tr. 2598:23-259:23.[11]

On May 15, approximately one week after returning from the business trip to Houston, plaintiff complained to defendant Feldman via email, alleging sexual harassment by defendant Matalon, consistent with the policy contained in defendant's employee manual.[12]  The following day, plaintiff had a meeting with Defendant Feldman, and Carol Battaglia, SMC's human resources director, in which plaintiff stated that she perceived Matalon's behavior to be ongoing sexual harassment.[13]  Plaintiff was given the option of (1) looking for a job outside of SMC, (2) remaining in her current position with defendant Matalon as her supervisor; or (3) transferring to another department within SMC,

---

[11] Notes from an internal investigation by SMC human resources contain a series of questions and answers asked of defendant Matalon, including the question "did you ask Isabel [Manzo] to do you a favor and tell you a "bedtime story" because you could not fall asleep alone?" and answer "In the context of joking." Defendants' Rule 56.1 statement, ex. S.

[12] Defendants contest that portion of plaintiff's Rule 56.1 statement alleging that plaintiff's complaint email to Feldman was sent in accordance with the policies in defendants' employee manual.  Page three of the employee manual, under the subsection Equal Employment Opportunity, Harassment and Sexual Harassment policy, reads "[a]ll incidents of alleged harassment should immediately be reported to Edward Feldman or Angela Zirpoli."

[13] Mrs. Battaglia's notes from SMC's internal investigation following plaintiffs complaints state that the meeting occurred on March 15. Defendants' Rule 56.1 statement, ex. S

under the auspices of another supervisor.[14]  Plaintiff alleges
that the position offered in an alternate department would have
had a salary approximately half of what she was currently making
under defendant Matalon.  She remained in her current position.
She was terminated on June 7, 2009, purportedly for performance
reasons.

### *Defendant's Allegations of Performance Errors*

Defendant alleges that plaintiff was terminated because of
repeated performance errors that caused SMC monetary and
reputational harm.  Defendant contends that shortly after
plaintiff's tenure began in the Fleet Department, the Accounting
Department at SMC began receiving notifications from the
automobile company Mercedes, of whose cars SMC is an authorized
retailer, of numerous contract discrepancies[15] emanating
primarily from the Fleet Department.  According to defendants,
although errors may have been created in the first instance by
any number of SMC employees, plaintiff bore ultimate
responsibility because, as Fleet Assistant, she was responsible
for conducting a final check that SMC had all of the paperwork
needed to complete a lease contract, and that certain required

---

[14] Defendants additionally contend that plaintiff was given the option
of remaking with Defendant Matalon as her supervisor, but moving the physical
location of her desk.

[15] The term "contract discrepancies" refers to missing or erroneous
information submitted by SMC which could cause a bank or leasing company to
reject a lease contract.  These included, *inter alia*, failure to factor in a
required "gas guzzler" tax into the contract price, Plaintiff Tr. 174:23-
175:6, or a failure to include proof of the driver's insurance coverage.

fees were included in the contract price charged to customers. Defendants Rule 56.1 statement ¶ 18 (Van Etten Tr. 125:10-129:15. *See also* Matalon Tr. 102-117). Several of these discrepancies had the potential to cause financial losses for SMC.[16]

Plaintiff was hired by SMC as Inventory Control Manager on February 26, 2007. According to SMC's employee handbook, all newly hired employees serve a 90-day "orientation period," which "gives an employee's immediate supervisor the opportunity to assess the employee's ability to perform the assigned duties of his/her position."[17] The handbook provides that an evaluation will be performed upon the completion of the orientation period. It is uncontested that plaintiff had no prior experience in the auto industry, and so informed defendant Matalon. She and was not given any formal interview prior to being hired.[18] As Inventory Control Manager, her primary duties were to swap vehicles, order cars, stock cars and prepare transport bills. Defendant does not claim plaintiff's performance as Inventory Control Manager was deficient.

---

[16] Plaintiff contends that no actual losses occurred because (1) the $200,000 figure represented a temporary debit from SMC's account that was replaced once the discrepancies were corrected; and (2) the $8000 loss was passed on to Matalon; SMC itself did not incur the monetary loss. Plaintiff's Rule 56.1 statement ¶ 34.

[17] Plaintiff disputes defendants' characterization of the orientation period as a "probationary period" and does not concede that she was advised of the existence of such a probationary period, but does not dispute the contents of the employee handbook. Plaintiff's Rule 56.1 Statement ¶ 4.

[18] Defendants contend that plaintiff was interviewed by defendant Matalon, albeit informally. Defendant Matalon testified that he typically interviewed prospective employees by "having a conversation." Statement Pursuant to Local Rule 56.1, Response 69; deposition of Jack Matalon at 296-97.

Plaintiff began work in the Fleet Department approximately one month later, around the beginning of April, 2007. Plaintiff testified that her job duties included speaking to leasing companies to locate cars for customers, collecting paperwork from clients, preparing leasing contracts so that they could be processed, and inputting data given to her by either defendant Matalon or by leasing companies. Manzo Tr. at 72:22-73:13, 175:10-17. Defendant contends that plaintiff was additionally responsible for verifying the data for accuracy and completeness before inputting it, and that plaintiff was the only person in the Fleet Department charged with these responsibilities. SMC hired a second Fleet Assistant, Kimmy Mandel, on or about May 14, 2007. Plaintiff Tr. 301:3-7.

The evidence in the record concerning plaintiff's training is inconsistent. Plaintiff stated in deposition testimony that the sole training or explanation of the duties she would have in her position in the Fleet Department consisted of instruction from Defendant Matalon on an "as-it-came-in" basis, including instruction on how to "bill a deal." Plaintiff Tr. 95:23-97:9. However, SMC assistant controller Van Etten stated in deposition testimony that, in addition to instruction from Matalon, plaintiff was provided training by Van Etten "sit[ing] with" plaintiff for two or three hours daily for approximately one week, and pointing out errors as they arose. Van Etten Tr. 40-45. Ms. Van Etten testified that additional offers of help were refused by plaintiff on a number of occasions.

The evidence concerning when contract discrepancies first came to SMC's attention and when plaintiff was first informed of those discrepancies is not consistent. While it is undisputed that on or about May 19, 2009, Mercedes brought to SMC's attention a large number of contract errors, and that a list of contract errors was presented to plaintiff upon her termination on June 7, there is no conclusive evidence in the record that plaintiff was informed of any contract discrepancies prior to May 19.[19]

In approximately the end of April or beginning of May, defendant Matalon determined that plaintiff would be permitted to train to become a sales assistant in the Corporate Fleet Sales Department. Rule 56.1 Statement and Reply ¶¶ 93-94, Zirpoli Deposition Tr. 37-41.[20] However, plaintiff never began work in the Sales Department, and on June 7, 2007 was terminated.

## **Discussion**

Summary judgment is appropriate "[w]hen the record taken as

---

[19] Ms. Van Etten stated in deposition testimony that she recalled first specifically becoming aware of contract discrepancies when she received a long list of errors from Mercedes in late May. Deposition of Doreen Vanetten 52:22-53:3. She testified that she discussed the discrepancies with plaintiff as they arose, but could not state with certainty when that occurred. Her testimony was ambiguous as to whether she discussed any discrepancy with plaintiff prior to May 19. *Id.* at 206-09. Defendant Matalon testified that he first informed plaintiff of a list of discrepancies at some time in May. Tr. 108.

[20] Plaintiff contends that the transfer would have constituted a promotion and that she assisted in training her replacement; defendant disputes both facts.

a whole could not lead a rational trier of fact to find for the
non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp.*, 475 U.S. 574, 587 (1986). Rule 56 of the Federal
Rules of Civil Procedure provides for summary judgment "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as matter of law." FED.
R. CIV. PRO. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S.
317, 322 (1986). "An issue of fact is genuine if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*,
320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it
"might affect the outcome of the suit under the governing law."
*Id.*

The party seeking summary judgment has the burden of
demonstrating that no genuine issue of material fact exists.
*Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In
order to defeat such a motion, the non-moving party must raise a
genuine issue of material fact. Although all facts and
inferences therefrom are to be construed in the light most
favorable to the non-moving party, the non-moving party must
raise more than a metaphysical doubt as to the material facts.
*See Matsushita*, 475 U.S. at 586; *Harlen Assoc. v. Vill. of
Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party
may not rely on conclusory allegations or unsubstantiated

speculation. *Twin Labs., Inc., v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

**Title VII Harassment Claims**

"[A] violation of Title VII may be predicated on either of two types of sexual harassment (1) harassment that involves the conditioning of employment benefits on sexual favors, and (2) harassment that, while not affecting economic benefits, creates a hostile or offensive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399 at 2400, 91 L.Ed.2d 49 (1986.[21] The former has been termed gender-based adverse

---

[21] The EEOC Guidelines on Discrimination Because of Sex provide:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's

(continued...)

employment action or "*quid pro quo*" harassment, while the latter
termed "hostile work environment" or "abusive work environment."
*See Hill v. Children's Village*, 196 F. Supp. 2d 389, 393
(S.D.N.Y. 2002) (stating that the distinction may serve "as a
convenient shorthand for distinguishing cases where threats are
carried out from those where they are not").

Plaintiff has pled only hostile work environment as a basis
for her Title VII claims.  However, the Second Circuit has held
that plaintiff's need not distinguish between hostile work
environment and *quid pro quo* claims, since:

> The law does not create separate causes of action for sex
> discrimination depending on the reason the employer denies a
> woman a job or a job benefit . . . What matters, instead, is
> simply whether an employment action was based on plaintiff's
> sex.  Similarly, there is no reason to create a separate
> doctrinal category for employers who make women's workplace
> success contingent on submission to a supervisor's sexual
> demands. For such a sexual quid pro is just another way in
> which an employer, in violation of Title VII, makes an
> employee's sex relevant to an employment decision."

*Gregory v. Daly*, 243 F.3d 687, 698-99 (2d Cir. 2001).

Accordingly, although plaintiff has not pled a claim premised on
a *quid pro quo* theory of harassment, I will consider evidence of
*quid pro quo* harassment as equally relevant to establishing

---

[21](...continued)
employment, (2) submission to or rejection of such conduct by an
individual is used as the basis for employment decisions affecting such
individual, or (3) such conduct has the purpose or effect of
unreasonably interfering with an individual's work performance or
creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11 (1999).  EEOC interpretive guidelines "while not
controlling upon the courts by reason of their authority, do constitute a body
of experience and informed judgment to which courts and litigants may properly
resort for guidance." *Meritor,* 106 S.Ct. at 2404.

plaintiff's claim for hostile work environment sexual harassment.

The Supreme Court has interpreted Title VII to prohibit "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated. *Id.* (*citing Meritor* 106 S.Ct. 2399 at 2404).

To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained-of conduct: "(1) is objectively severe or pervasive--that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal citations, quotation marks and ellipses omitted). "[I]t is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano v. Castello,* 294 F.3d 365, 374 (2d Cir. 2004)(internal quotation marks and citations omitted). The Second Circuit has cautioned:

> Everyone can be characterized by sex, race . . . and many
> bosses are harsh, unjust, and rude. It is therefore
> important in hostile work environment cases to exclude from

consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano*, 294 F.3d at 377 (citations omitted).  However, "[w]hile the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse."  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 1993) (internal citations, quotation marks, and alteration omitted). Factors to consider in determining whether an environment is hostile or abusive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.  Although "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred," they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition."  *Svenningsen v. Coll. of Staten Island*, No. 01-CV-7550, 2003 WL 21143076, at *2 (E.D.N.Y. Mar. 28, 2003) (citing *Gregory v. Daly*, 243 F.3d 687, 694-95 (2d Cir. 2001)).  Isolated incidents of offensive conduct are

generally inadequate to establish a hostile work environment claim; plaintiff must show "either a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted" to cause a change in the work environment. *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation omitted).

Defendants have not established that the deposition testimony, affidavits, and other admissible evidence "could not lead a rational trier of fact to find for" the plaintiff. *Matsushita*, 475 U.S. at 587. While defendants contend that the incidents alleged by plaintiff were "isolated," comparatively mild, and not sufficiently egregious to have altered the terms and conditions of her employment, the record reflects a number of disputed issues of fact which, if resolved in favor of plaintiff, would support the finding that plaintiff was subject to a pervasive course of harassing remarks and behavior that was sufficiently severe as to create an environment that a reasonable person would find hostile or abusive.

The record is undisputed that defendant Matalon offered plaintiff a position at SMC after meeting her at a bank, despite plaintiff's lack of any relevant experience in the automobile industry. Defendant Manzo testified that he offered plaintiff the position after having observed her interacting with clients at the bank "maybe three [or] four" times, with each interaction

lasting "seconds."[22]  He also stated that he found her to be
physically attractive, but denied that fact had any role in the
decision to hire plaintiff.  Matalon Tr. 52-53.  He did not
contact plaintiff's references or request a resume.  Even
crediting defendant Matalon's claim that prior experience was not
a prerequisite for the Inventory Control Manager position, and
that his standard practice was not to conduct formal interviews
or request references or a resume from applicants, a reasonable
fact-finder could conclude that plaintiff was hired in part due
to defendant Matalon's romantic interest in plaintiff.

  Plaintiff testified in deposition testimony that Defendant
Matalon initially proposed that plaintiff transfer to his
department and instructed plaintiff to complain about her pay as
Inventory Control Manager in order to convince SMC to permit the
transfer.  The testimony, if believed, supports the conclusion
that defendant Matalon "engineered" her transfer into the Fleet
Department and could be relied on by a rational fact-finder as
further evidence of his ulterior motives in hiring plaintiff.[23]

---

[22] In deposition testimony, in response to questioning by plaintiff's
counsel, Defendant Matalon stated he didn't "specifically remember if I
approached her or she approached me or I offered it to her or she asked about
it." Manzo Tr. 77.

[23] A fact-finder could find defendant Matalon's deposition testimony on
the subject to be evasive and non-credible.  *See* Matalon Tr. 90 (stating that
he was not concerned in offering plaintiff a position in the Fleet Department
about negative reviews she had gotten from supervisors in her previous
position).  *See also id.* at 91 (Q. Did you tell Miss Manzo that you wanted her
to move to your department?  A.  I mentioned that the opportunity may be
there.. . . Q. Did you ever tell Miss Manzo that you wanted her to move to
your department?  A. I mentioned that it may be come an opportunity that - -
that is becoming available.").

(continued...)

A fact-finder crediting plaintiff's account could also conclude that the unwanted advances were so pervasive and severe as to constitute "objectively severe or pervasive" conduct. Plaintiff's deposition testimony states that unwanted sexual advances from defendant Matalon began a mere two days after she began employment when he informed plaintiff that he would like to leave his wife, that he believed he could have "a special relationship" with plaintiff, and that plaintiff seemed like "a special girl."  Plaintiff Tr. 80.[24] Plaintiff stated defendants compliments and remarks about her being a "special person," that they could be great friends, were a "daily occurrence."  Tr. 89, and that after each comment that plaintiff found inappropriate, she expressed to defendant matalon that she did not like the comment.  Tr. 92.

Plaintiff alleges that defendant Matalon's romantic overtures continued despite her statement that she did not find the comments appropriate.  She alleges that defendant Matalon called her on a Saturday evening to tell her he thought she was a special girl and ask whether she would ever marry someone like

---

[23](...continued)

[24] Defendants' contend that plaintiffs' having asked defendant Matalon why he didn't leave his wife if he was so unhappy, (plaintiff Tr. 80), could be construed as "an invitation for Mr. Matalon to provide her with personal information," Defendant's Rule 56.1 Reply ¶ 72, but do not appear to contend that plaintiff ever suggested to defendant Matalon, either explicitly or implicitly, that she was interested in a romantic relationship.  Assuming arguendo that defendants seek to establish that defendant Matalon's advances were not hostile or abuse in light of his reasonable belief that his romantic feelings were reciprocated, the reasonableness of such a believe would constitute a factual dispute that cannot be resolved on summary judgment.

him, and approached her at her desk numerous times to ask her
out.  Tr. 123.  Plaintiff testified that on several occasions,
defendant Matalon tied the romantic request to the conditions of
work, allegedly stating, after plaintiff declined his request for
dinner or drinks by saying she had too much work, "Okay, well,
fine, tomorrow I'll have to make sure that I don't give you too
much work so that you can leave earlier, go home, get whatever
you need to get done, and you'll have no excuse not to go out
with me."  Tr. 124.  Plaintiff alleges that on another occasion,
after declining defendant Matalon's invitation to have dinner and
play racquetball, he responded, in substance, that he had doubts
about plaintiff's successful employment at SMC. Plaintiff Tr.
133.  On another occasion, defendant allegedly promised plaintiff
a $1500 bonus for SMC's sales during the month of April, but
"decided to deduct [$500] because he felt [plaintiff] was
unappreciative and [] did not care about all the things
[defendant] has offered" to her.  Plaintiff's Rule 56.1 statement
¶¶ 78-79 & Ex. 4; Plaintiff Tr. 125.[25]  Finally, a rational fact-
finder could credit plaintiff's account of the events in Houston,
including defendant's entering her room on the pretext of needing
to call the front desk to get a new key, lying down on her bed,
unbuttoning several buttons on his shirt, and requesting a
"bedtime story."

---

[25] Defendant Matalon testified that he inadvertently paid plaintiff only
$1000 because he had forgotten the amount initially promised, and that after
listening to her complaint about the discrepancy, paid her the difference of
$500 in cash, out of his own pocket.  Matalon Tr. 95.

In addition, there is a triable issue of fact as to whether plaintiff subjectively perceived defendants' conduct as hostile or abusive.  Defendants contend that plaintiff's actions suggest she did not subjectively regard defendant Matalon's conduct as hostile, including plaintiff's: acceding to defendant's requests that she transfer into his department, participating in discussions of a personal nature with him, accompany him on a three day trip to Houston, failing to end the trip early after the alleged "hotel room incident" on the second day, failing to file an internal complaint until a week after the Houston trip, and refusing SMC's offer to transfer out of defendant Matalon's department.  In sum, defendant argues that plaintiff must not have considered defendant Matalon's actions offensive because she didn't complain sooner or louder.  The arguments fail; the veracity of plaintiff's stated perception of defendants conduct as hostile or abusive is a typical example of a factual dispute that cannot be resolved on summary judgment.  As the Second Circuit held, in *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 79 (2d Cir. 2000), conduct need not be "unendurable" or "intolerable" to make a work environment hostile.  That plaintiff did not earlier file a complaint against or refuse to work with defendant Matalon -- which she could reasonably fear might jeopardize her employment -- does not establish that the defendants' conduct was not sufficiently severe.  In addition, a fact-finder could credit plaintiff's explanation that until the Houston hotel room incident, she believed she could tolerate the

harassing remarks, and that defendant Matalon's conduct might improve.

Based on the record evidence above, a reasonable fact-finder could well conclude that plaintiff was subjected to a discriminatory hostile work environment in violation of Title VII.

## Title VII Retaliation Claims

Defendants argue that summary judgment should be granted as to plaintiff's retaliation claims because plaintiff has not shown the required causal connection between any protected activity and an adverse employment action.

To make out a prima facie case of retaliation, an employee must demonstrate: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 546-47 (E.D.N.Y. 2003) (*citing Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998), *abrogated in part on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). A protected activity is any "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores*, 202 F.3d 560, 566 (2d Cir. 2000). In order to prove that she engaged in a protected activity, plaintiff need not show that conduct complained of was unlawful as long as the plaintiff had a "*good*

*faith, reasonable belief* that the underlying challenged actions
of the employer violated the law." *Quinn*, 159 F.3d at 769
(emphasis in original)(quoting *Manoharan v. Columbia Univ.
College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d. Cir.
1988)). The adverse employment action must be one that a
reasonable employee would have found materially adverse; i.e., it
"might have dissuaded a reasonable worker from making or
supporting a charge of discrimination." *Burlington N. & Sante Fe
Ry. Co.*, 548 U.S. at 68 (internal quotation marks and citation
omitted).

The anti-retaliation provision of Title VII is violated when
a retaliatory motive plays a part in an adverse employment action
towards an employee, whether or not it was the sole cause, so
long as the retaliatory motive is at least a "substantial" or
"motivating" factor behind the adverse action. *See Terry v.
Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003); *Raniola v.
Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). A plaintiff may prove
that an adverse employment action was influenced by an employer's
retaliatory motive either "(1) indirectly, by showing that the
protected activity was followed closely by discriminatory
treatment, or through other circumstantial evidence. . .; or (2)
directly, through evidence of retaliatory animus directed against
the plaintiff by defendant." *Gordon v. N.Y. City Bd. of Educ.*,
232 F.3d 111, 117 (2d Cir. 2000).

Here, defendants have failed to establish that no
rational trier of fact could find for the plaintiff. The burden

of proof in retaliation claims follows the general disparate treatment analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Shah v. N.Y. State Dept. of Civil Service*, No. 01-9009-cv, 2009 WL 1868567 (2d Cir. June 30, 2009). The initial burden is on the plaintiff to establish a prima facie case of discrimination by raising an inference or presumption of unlawful discrimination. Second, if the plaintiff establishes a prima facie case, "the burden of production shifts to the defendant to provide a non-retaliatory, legitimate business reason for the alleged retaliatory employment action. If the employer meets this burden of production, the burden shifts back to the plaintiff, who must demonstrate that the employer's reason was a pretext for retaliation." *Shah*, 2009 WL 1868567, at *1. *See generally*, 45C Am. Jur. 2d Job Discrimination § 2443 (2009).

Plaintiff has adequately alleged that she engaged in a protected activity by complaining about defendant Matalon's behavior first to defendant Matalon himself, and then to defendant Feldman pursuant to SMC's sexual harassment policy. Plaintiff has also alleged that defendant SMC took an employment action disadvantaging her, namely, that defendant SMC terminated her on June 7, 2007. The temporal proximity between plaintiff's May 2007 complaint to defendant Feldman and her June 7, 2007 termination is sufficient to support an inference of causation. *See Uddin v. City of New York*, 427 F. Supp. 2d 414, 432 (S.D.N.Y. 2006) (causation "can be established by showing that the retaliatory action was close in time to the protected activity")

(citing *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)); *Harrison v. North Shore Univ. Hosp.*, No. 04-CV-2033, 2008 WL 656674, at *12 (E.D.N.Y. 2008) (one to two months sufficient to support inference of causation); *Battice v. Phillip*, No. 04-CV-669, 2006 WL 2190565, at *8 (E.D.N.Y. 2006) (over four months insufficient to support an inference of causal connection).

Having established a prima facie inference of discrimination, the burden shifts to the defendant to prove that a non-retaliatory, legitimate business reason for the alleged retaliatory employment action. Defendants may well be able to prevail at trial under the *McDonnell Douglas* analysis by convincing a fact-finder that they maintained legitimate non-retaliatory reasons for plaintiff's discrimination. But there remain genuine issues of material fact as to whether defendant's stated reasons were truly non-retaliatory which preclude summary judgment.

A plaintiff "need not demonstrate that his [or her] performance was flawless or superior. Rather, [s]he need only demonstrate that [s]he possesses the basic skills necessary for performance of [the] job." *Shahid v. New York City Health and Hospital Corp.*, No. 03 Civ. 8413(HB), 2004 WL 2912903, at *5 (S.D.N.Y. Dec. 15, 2004) (*citing De la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996). In support of their claim that defendant's performance constitutes a legitimate non-retaliatory reason for her

termination, defendants contend that (1) plaintiff was counseled about her poor performance before she made claims of sexual harassment; (2) plaintiff's errors resulted in almost $8000 in actual losses, a $200,000 debit, over $1 million in potential losses, the threatened loss of Sovereign's ability to pre-finance car sales with its financier, Mercedes, and being placed on a high scrutiny watch list by Mercedes which detrimentally affected Sovereign's ability to obtain new credit for its customers and close deals. Def. Br. at 12-13.

However, there remain a number of unresolved factual issues that preclude summary judgment premised on defendant's claim that plaintiff's performance was deficient: (1) whether Plaintiff was at any time counseled about her performance prior to her termination;[26] (2) each of the alleged deficiencies in performance by the plaintiff are premised on defendants' claim that as Fleet Assistant, plaintiff bore ultimate responsibility because for contract discrepancies, even where those discrepancies may have been created in the first instance by other SMC employees. A reasonable fact-finder could conclude, based on the evidence in the record, that plaintiff was not in fact assigned the responsibility of checking the data-entry work by other employees, and that the alleged deficiencies in her performance therefore constitute post-hoc justifications for

---

[26] Plaintiff contends that she was not provided any notification about deficiencies in her performance until just before her termination. Defendant has not produced any written evidence of any performance evaluation.

plaintiff's termination[27]; (3) the parties do not dispute that in
May of 2007, plaintiff was to be imminently transferred to a
position in corporate sales, a change in position that plaintiff
contends is a promotion.  A reasonable fact-finder could conclude
that plaintiff's planned promotion (if in fact that is proven to
be an accurate description of the change in position) undermines
a claim of deficient performance; and (4) testimony in the record
suggests that contract discrepancies arose within approximately
one week (or at most two weeks) of a contract being submitted.
If a fact-finder concluded that discrepancies came to SMC's
attention within that short period of time, then the fact that
errors did not arise until May 19 would suggest (a) plaintiff's
performance was in fact non-deficient for the bulk of her tenure
at SMC, and (b) culpability for the errors may properly be
attributed to a different SMC employee hired in the capacity of
Fleet Assistant in mid-May 2007.  *See* note 25, supra.

## Imputation of Liability to Employer for Title VII Claims

Defendants' contend that even if plaintiff were able to
prove that a hostile work environment existed, dismissal on

---

[27]    Defendants have not produced any written evidence that plaintiff
bore ultimate responsibility for all contract discrepancies.  Moreover,
plaintiff's sworn affidavit alleges that (1) a second individual, Kimmy
Mandel, was hired in mid-May of 2007 to take over the job of Fleet Assistant,
and (2) Angela Zirpoli informed plaintiff that any mistakes that had been
attributed to plaintiff (referring to discrepancies on a list of contract
errors from Mercedes received by SMC on or about May 19, 2007), were not
plaintiff's fault because plaintiff had not been properly trained. Affidavit
of Isabel Manzo dated August 20, 2009 ¶¶ 2-3.

summary judgment is warranted because defendant can establish a
defense of reasonable care.  In general, a defendant employer
will be liable for the actions of its employee unless it
successfully establishes that (a) it "exercised reasonable care
to prevent and correct promptly any sexually harassing behavior,"
and (b) "the plaintiff employee unreasonably failed to take
advantage of any preventive or corrective opportunities provided
by the employer or to avoid harm otherwise." *Faragher v. City of
Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662
(1998).  *See also Burlington*, 118 S.Ct. at 2261.[28]

The defendant bears the burden of providing the defense of
reasonable care. *Id.* at 2270.  "No affirmative defense is
available, however, when the supervisor's harassment culminates
in a tangible employment action, such as discharge, demotion, or
undesirable reassignment." *Id.* As the Second Circuit held in
*Bolick v. Alea Group Holdings, Ltd.*

> When, as here, the alleged misbehavior involves a
> supervisory employee, the employer may be held vicariously
> liable. Where the harassment is attributed to a supervisor,
> a court looks first to whether the supervisor's behavior
> culminate[d] in a tangible employment action against the
> employee such as hiring, firing, failing to promote,
> reassignment with significantly different responsibilities,
> or a decision causing a significant change in benefits. If
> it did, the employer will, ipso facto, be vicariously
> liable.

202 Fed. Appx. 474 (2d Cir. 2006) (citations and quotation marks

---

[28] The doctrine has been termed the "*Faragher-Ellerth* defense." *See,
e.g.* Zakrzewska v. New School, 574 F.3d 24 (2d Cir. 2009).

omitted, alteration in original).

Defendants have not established a defense of reasonable care for summary judgment purposes because triable issues of fact remain as to two prerequisites to defendants' claiming the defense. First, a triable issue of fact remains as to whether plaintiff was terminated as a result of her complaints regarding defendant Matalon's conduct. If defendant's actions culminated in the discriminatory act of plaintiff's termination, the defense of reasonable care would be *ipso facto* unavailable. Moreover, triable issues of fact remain as to whether defendants "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Although an employer's prompt and effective action in response to a complaint of sexual harassment can absolve the employer of liability under Title VII, "an employer's remedy must be real and not a 'sham.'" *Trotta v. Mobil Oil Corp.*, 788 F. Supp. 1336, 1351 (S.D.N.Y. 1992) (*citing Kotcher v. Rosa*, 957 F.2d 59, 66 (2d Cir. 1992). Defendants contend that they took immediate care to investigate and promptly address plaintiff's concerns. However, questions of material fact remain in the record concerning whether defendants' investigation and remedial action was adequate.[29]

---

[29] While defendants contend that defendant Matalon was counseled and required to undergo sexual harassment training, the record fails to establish that such training took place. *See, e.g.*, Feldman Tr. 89 ("I believe we immediately told [Matalon] to enroll in sensitivity training through our insurance provider. I think Carol [Battaglia] had given him some reading materials as well.") Tr. ("Q. Did you follow up and determine whether or not Mr. Matalon attended that sensitivity training? A. I did not."). Battaglia Tr. ("Q. Did you make the decision to have Mr. Matalon watch [two 45 minute]

(continued...)

**New York City Human Rights Law Claims**

Plaintiff's sixth, seventh and eighth claims allege (6) gender discrimination in violation of the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code §§ 8-107 *et seq.;* (7) retaliation in violation of the NYCHRL, and (8) sexual harassment in violation of the NYCHRL.

Determination of whether a substantive sexual harassment or retaliation violation has occurred under the NYCHRL is satisfied where the standards of Title VII would be met,[30] however, unlike Title VII, individual liability is available under the NYCHRL. *Fleming v. MaxMara USA, Inc.*, --- F.Supp.2d ----, 2009 WL 1910946 (E.D.N.Y. 2009). In addition, the standards for imputing liability to an employer differ: "[i]t has been well documented, by both federal courts within the Second Circuit and by New York state courts, that employer liability under the NYHRL . . . requires a more stringent showing [than it does under Title VII], in particular, that the employer had knowledge of and acquiesced in, or subsequently condoned, the discriminatory conduct. *E.E.O.C. v. Rotary Corp.*, 297 F. Supp. 2d 643, 665 (N.D.N.Y.

---

[29](...continued)
DVDs instead of going to a type of sexual harassment seminar or training? A. I couldn't get one. So yes, I made the decision to have him view [DVDs].");
Battaglia Tr. 145 ("Q. Do you know if Mr. Matalon watched the DVDs? A. I don't know.").


[30] Plaintiff contends that the NYCHRL was intended to be more protective than its state and federal counterparts, and may be satisfied by a less demanding showing. Because I have found plaintiff raised triable issues of fact with regard to her Title VII claims, I need not address whether the NYCHRL might be violated by a pattern of harassment less severe than that which is required under Title VII.

2003). "Condonation . . . .contemplates a knowing, after the fact
forgiveness or acceptance of an offense.  An employer's
calculated inaction in response to discriminatory conduct may, as
readily as affirmative conduct, indicate condonation.' *Father
Belle Cmty. Ctr. v. State Div. of Human Rights ex rel. King*, 221
A.D.2d 44, 642 N.Y.S.2d 739, 746 (App. Div. 1996)).

Even under this more stringent standard, summary judgment is
not warranted.  Plaintiff has raised a triable issue of fact
concerning whether SMC management condoning of or acquiescence in
the alleged harassment by defendant Matalon.  *See Capabilities,
Inc. v. State Div. of Human Rights*, 148 A.D.2d 861, 539 N.Y.S.2d
135 (N.Y. App. Div. 1989) (considering failure to apologize to
employee subject to discrimination or take appropriate action
against perpetrator of harassment as evidence of acquiescence);
*McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.,* 175 Misc.2d
795, 803, 669 N.Y.S.2d 122, 128 (N.Y. Supr. 1997) ("Condonation
may be established by knowledge of the discriminatory conduct
acquired after the fact, combined with insufficient investigation
and/or insufficient corrective action.").

## Conclusion

For the reasons stated, the motion for summary judgment is
granted with respect to plaintiffs claims in Counts I, II, and
III of the complaint, and denied with respect to the remaining

claims.  The Clerk is directed to furnish a filed copy of the

within to all parties.

SO ORDERED.


Dated :   Brooklyn, New York
          September 22, 2009

                        By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                            United States District Judge