UNITED STATES DISTRICT COURT                    FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                        :
ISABEL MANZO,                           :
                                        :
                          *Plaintiff*,  :         MEMORANDUM
                                        :         AND ORDER____
          - against -                   :
                                        :
                                        :         08-CV-1229 (JG)(SMG)
SOVEREIGN MOTOR CARS, LTD.,             :
EDWARD FELDMAN, and JACK                :
MATALON,                                :
                                        :
                          *Defendants*. :
-----------------------------------------------------X

A P P E A R A N C E S :


          MOSKOWITZ, BOOK & WALSH, LLP
               345 Seventh Avenue, 21st Fl.
               New York, NY 10001
          By:  Avraham C. Moskowitz
               Jonathan S. Konovitch
               *Attorneys for Plaintiff*


          WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
               150 East 42nd St.
               New York, NY 10017
          By:  Ricki E. Roer
               Nancy V. Wright
               *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

          Plaintiff Isabel Manzo brought this action pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*., and the New York City Human

Rights Law, New York City Administrative Code ("NYCHRL") §§ 8-107 *et seq*., alleging that

defendants sexually harassed Manzo through the creation of a hostile work environment and fired her in retaliation for her complaining about it.[1] On January 25, 2010, following a five-day trial, the jury returned a verdict in Manzo's favor and awarded her $50,000 in compensatory damages and $200,000 in punitive damages. Defendants now move pursuant to Fed. R. Civ. P. 50(b) to set aside the punitive damage award as a matter of law, or, in the alternative, for a remittitur or a new trial pursuant to Fed. R. Civ. P. 59(a) and (e). Manzo moves pursuant to 42 U.S.C. § 2000e-5(k) and Fed. R. Civ. P. 54(d)(1) for an award of attorneys' fees and costs.

The defendants' motion is denied in its entirety; the plaintiff's motion is granted to the extent set forth below.

## BACKGROUND

Familiarity with the facts and procedural history of the case is assumed. For a more complete description of the underlying facts, *see Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229 (CPS), 2009 WL 3151094 (E.D.N.Y. Sept. 29, 2009). A brief summary of the essential facts follows.

Isabel Manzo was an employee of Sovereign Motor Cars ("SMC"), a Mercedes-Benz retailer, from February 26, 2007 until June 7, 2007. During that relatively brief period of employment, she was subjected to a continuous and concerted campaign of sexually harassing remarks and behavior by her direct supervisor, Jack Matalon, and she was fired in direct retaliation for filing of a complaint of sexual harassment with SMC's vice president, Edward Feldman. At trial, defendants disputed that any sexual harassment had occurred and argued that the company had promptly investigated and addressed Manzo's complaint. The defendants

---

[1] Plaintiff also alleged claims relating to unpaid commissions and overtime compensation, which were withdrawn prior to trial.

2

asserted that Manzo was terminated for performance-based reasons.  The jury credited Manzo's

testimony and awarded her $25,000 for her hostile work environment claim against SMC and

Matalon, $25,000 for her retaliation claim against SMC and Feldman, and at total of $200,000 in

punitive damages, of which it attributed $50,000 to SMC, $50,000 to Feldman, and $100,000 to

Matalon.

DISCUSSION

A.      Defendants' Challenge to Punitive Damages

Defendants seek to set aside the punitive damage award as a matter of law

pursuant to Fed. R. Civ. P. 50(b), or, in the alternative, for a remittitur or a new trial pursuant to

Fed. R. Civ. P. 59(a) and (e).  Defendants do not challenge the jury's finding of liability or its

award of compensatory damages.

1.      Standard of Review

Federal Rule of Civil Procedure 50 provides that where there is no "legally

sufficient evidentiary basis" for a reasonable jury to find for a party on a particular issue, the

court may resolve the issue against that party and may grant a motion for judgment as a matter of

law.  "A movant seeking to set aside a jury verdict faces a 'high bar.'"  *See Tse v. UBS Fin.*

*Servs., Inc.*, 568 F. Supp. 2d 274, 311-12 (S.D.N.Y. 2008) (citing *Lavin-McEleney v. Marist*

*Coll.*, 239 F.3d 476, 479 (2d Cir. 2001)).  "A jury verdict should be set aside under Rule 50 only

where there is 'such a complete absence of evidence supporting the verdict that the jury's

findings could only have been the result of sheer surmise and conjecture,' or where there is 'such

an overwhelming amount of evidence in favor of the movant that reasonable and fair minded

[jurors] could not arrive at a verdict against him.'"  *Id.* (citing *Kosmynka v. Polaris Indus., Inc.*,

3

462 F.3d 74, 79 (2d Cir. 2006)).  In making its determination, the court must not make credibility assessments and must view the evidence in the light most favorable to the non-moving party. *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001).  Accordingly, while the court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 15 (2000).

The standard for granting a new trial pursuant to Fed. R. Civ. P. 59 "is less stringent than that for judgment as a matter of law." *Zakre*, 541 F. Supp. 2d at 560.  A motion for a new trial should be granted when, in the opinion of the district court, "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *Song v. Ives Labs., Inc*., 957 F.2d 1041, 1047 (2d Cir. 1992).  In contrast to a motion for judgment as a matter of law, a new trial may be granted even if there is substantial evidence to support the jury's verdict. *Id.*  Moreover, "a trial judge hearing a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'"  *Id.* (citation omitted).  However, "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Zakre*, 541 F. Supp. 2d at 560 (citing *Piesco v. Koch*, 12 F.3d 332, 345 (2d Cir. 1993)).

If a district court finds that a verdict is excessive, it may reduce the jury's award through the process of a remittitur, whereby a plaintiff is given the option of either accepting damages in a (specified) reduced amount or consenting to a new trial.  *See Cross v. N.Y. City Transit Auth*., 417 F.3d 241, 258 (2d Cir. 2005).  However, "it is not among the powers of the

trial court, where the jury has awarded excessive damages, simply to reduce the damages without offering the prevailing party the option of a new trial." *Zakre*, 541 F. Supp. 2d at 560.

2.      Motion to Vacate the Punitive Damages Award as a Matter of Law

Punitive damages may be awarded for a civil rights claim against a defendant employer under either Title VII or the NYCHRL if "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Tolbert*, 242 F.3d at 77 (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)); *see also* 42 U.S.C. § 1981a(b)(1). An award of punitive damages against an individual is governed by the same standard, but such damages are available only under the NYCHRL.[2] *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995) (individual liability not available under Title VII). "Malice and reckless indifference refer to 'the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)).

Direct evidence that an employer acted with knowledge that the discrimination and retaliation violated federal law is not required; rather, the requisite state of mind may be inferred from the circumstances. *See, e.g.*, *Zimmermann*, 251 F.3d at 385 (general training in

---

[2]      Manzo argues that a different and more liberal standard should apply under the NYCHRL. However, she did not object to jury instructions utilizing the same language to refer to the standards governing punitive damages under the NYCHRL and Title VII, and case law has described those standards as being identical. *See Jordan v. Bates Adver. Holdings, Inc.*, 816 N.Y.S.2d 310, 322 (Supr. Ct. 2006) ("In analyzing whether to sustain an award of punitive damages under the New York City Human Rights Law, state courts apply the same framework used by the federal courts in actions brought pursuant to Title VII"); *see also Tse*, 568 F. Supp. 2d at 311-12 (noting that the same standard applies to claims for punitive damages under both Title VII and the NYCHRL (citing *Farias*, 259 F.3d at 101-02)). Though the standards for an award of punitive damages are the same, the statutory schemes are not entirely identical. For instance, under Title VII non-pecuniary damages, including punitive damages, are capped, whereas no caps exist under the New York City law. *See Zimmermann v. Assocs. First Capital Corp*, 251 F.3d 376, 384 (2d Cir. 2001). The differences are not relevant to this action.

equal opportunity protocol and hiring practices is sufficient to infer awareness of Title VII requirements); *see also Hill v. Airborne Frgt. Corp.*, 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002) ("Arguably, it was reasonable for the jury to infer that [defendant's] managers knew that their actions were in violation of federal law simply by virtue of the well-established Supreme Court case law on discrimination and retaliation, the long standing statutory schemes proscribing such conduct, the size of [defendant's company], and the common knowledge in today's society that employment discrimination is impermissible.").  Morever, where a defendant is aware that its actions violate federal law, it is not necessary that the misconduct itself be independently reprehensible or egregious.  *See Kolstad*, 527 U.S. at 538.

There is no dispute that the evidence at trial was sufficient to allow a reasonable jury to award compensatory damages.  However, defendants contend that the award of punitive damages was precluded as a matter of law on three grounds: (1) their actions were taken on the advice of counsel; (2) they believed their conduct was lawful; and (3) they made good faith efforts to promptly take corrective action following Manzo's complaint.  As explained below, each of these arguments is unavailing.

Consultation with counsel might show that a defendant lacked the requisite subjective intent to violate federal law, but it does not operate as a *per se* bar to an award of punitive damages.  *See Quinby v. WestLB AG*, No. 04-CV-7406 (WHP), 2008 WL 3826695, at *2 (S.D.N.Y. Aug. 15, 2008) ("[S]eeking advice of counsel does not as a matter of law preclude a punitive damage award; indeed, such consultation may instead establish that a defendant knew about the legal consequences of its action."); *see also Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 264 (S.D.N.Y. 1999) (rejecting challenge to punitive damages award and

6

concluding that "the fact that [defendant-employer] retained legal counsel does not establish as a matter of law that [it] must have been trying in good faith to refrain from retaliation."). Moreover, there was no testimony at trial concerning what advice was rendered by SMC's counsel, or evidence that defendants complied with any such advice. The bare fact that defendants spoke to an attorney after learning of Manzo's allegations, even if believed, does not preclude a finding that they acted with the subjective intent required for an award of punitive damages. *See Zakre*, 541 F. Supp. 2d at 562-63 (rejecting "advice of counsel" defense where there was no evidence as to what counsel told the defendant).

The contention that defendants actually believed their conduct to be lawful fails because the evidence at trial amply supported the jury's contrary conclusion. There was considerable evidence that Matalon and Feldman were aware that their conduct violated federal and city law. Matalon acknowledged that he was aware of the inappropriateness of sexual harassment in the workplace. *See* Tr. 633 ("At that time, harassment in the workplace was a big issue, and it was a very sensitive issue, and I wasn't -- I wasn't -- I should have been much more careful at that time."); *see also* Tr. 634 ("[O]f course we know [] all along [that] it's an issue. It's in the news all the time."). Multiple witnesses testified at trial as to the existence of Sovereign's anti-discrimination and harassment policies, which are set forth in SMC's employee manual. Matalon also conceded at trial that he was aware of the inappropriateness of certain of his comments to Manzo. *See* Tr. 628-29, 634. These facts are more than sufficient to permit a jury to infer that Matalon was aware his actions may have been in violation of the law. *See Tse*, 568 F. Supp. 2d at 309-10 (evidence that the employer was generally familiar with anti-discrimination law and knew its actions may be in violation of the law is sufficient to

support jury award of punitive damages).  A jury could also infer the requisite malice or intent

from the nature of Matalon's conduct.  *See Kolstad*, 527 U.S. at 538 ("To be sure, egregious or

outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive.'").

Manzo testified to an pattern of inappropriate remarks, culminating in one particularly egregious

incident occurring during a business trip, in which defendant Matalon entered her hotel room on

the pretense of having lost his room key, laid down on plaintiff's bed, unbuttoned his shirt, and

demanded a "bedtime story."  The egregiousness of such conduct can hardly be disputed.  *See*

Tr. 720 (reflecting Feldman's acknowledgment that the alleged behavior by Matalon, if true, was

"outrageous" and "very concerning.").

>    As for Feldman, who attended law school but does not practice law, he was

identified in SMC's employee manual as a contact person for reports of alleged harassment.  His

testimony at trial suggested that he was aware of the illegality of terminating an employee for

retaliatory reasons.  *See, e.g.*, Tr. 740-42.  Although there was testimony that Feldman promptly

directed an investigation into plaintiff's allegations, and he claimed that he fired Manzo due to

performance errors, the jury might have reasonably concluded that his asserted non-retaliatory

reasons were pretextual,[3] that the investigation was superficial, and that its outcome was

preordained.  Specifically, a reasonable juror might have inferred from Manzo's testimony, taken

together with the timing of her termination, Feldman's long-standing relationship with Matalon

and the limited reprimand and training received by Matalon (who continues to be employed at

---

[3]    For instance, Manzo first learned of alleged performance errors only after complaining of sexual harassment, and the bulk of the errors were attributable to other employees.  Tr. 183-87.  In addition, documentary evidence supported Manzo's assertion that prior to her complaint of sexual harassment, she had been informed that she would imminently be promoted.  Indeed, business cards that reflected her anticipated position had already been printed.  *See, e.g.*, Tr. 157-58.

SMC) that Feldman intentionally violated her rights in order to protect his business concerns and avoid a confrontation with Matalon, who generated significant business for SMC.[4]

Finally, defendants contest the punitive damages award by arguing that, as a matter of law, they are entitled to the affirmative defense recognized in *Kolstad*, which "insulates an employer from punitive damages liability if it has made 'good faith efforts to enforce an antidiscrimination policy.'" *Zimmermann*, 251 F.3d at 385 (citing *Kolstad*, 527 U.S. at 546). This argument fails because, as discussed above, a reasonable juror could have concluded that SMC's antidiscrimination policies were intentionally ignored by both Manzo's direct supervisor, Matalon, and by SMC's co-owner and vice-president, Feldman.[5]  *See Zimmerman*, 251 F.3d at 386 (written antidiscrimination policy does not automatically establish good faith enforcement).

> 3.    <u>Motion For a New Trial or a Remittitur</u>

Defendants argue that even if there existed sufficient evidence for an award of punitive damages, a new trial or a remittitur should be granted because the damages awarded were excessive.

Under federal law, punitive damage awards must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition," *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992) (citation omitted), and will be reversed if they are "so high as to shock the judicial conscience and constitute a denial of justice." *Hughes v. Patrolmen's Benevolent Ass'n*, 850 F.2d 876, 883 (2d Cir. 1988) (quoting *Zarcone v. Perry*,

---

[4]    At trial, Matalon testified that he earned approximately $220,000 at SMC in 2007, "in excess of $500,000" in 2008, and approximately $200,000 in 2009.  Tr. 562.

[5]    Manzo correctly notes that even if the *Kolstad* defense were established, it would apply only to corporate defendant SMC, and that it is considered only a "mitigating factor" and not a complete defense under the NYCHRL.  *See Jordan*, 816 N.Y.S.2d at 322.

572 F.2d 52, 56-57 (2d Cir. 1978)).  Under New York law, an award of punitive damages will

not be reduced "unless it is so grossly excessive 'as to show by its very exorbitancy that it was

actuated by passion.'"  *Greenbaum*, 67 F. Supp. 2d at 267 (citing *Nardelli v. Stamberg*, 44

N.Y.2d 500, 503 (1978)).  Neither party argues that these standards are materially different.

   Whether they are awarded under New York or federal law, punitive damages

must also comport with due process, which prohibits any punishment that is "grossly out of

proportion to the severity of the offense."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568

(1996).  The Supreme Court has identified three "guideposts" relevant to our application of that

standard: "'(1) the degree of reprehensibility of the [defendant's] conduct; (2) the ratio of

punitive damages to compensatory damages; and (3) the difference between this remedy and the

civil penalties authorized or imposed in comparable cases.'"  *Patterson v. Balsamico*, 440 F.3d

104 (2d Cir. 2006) (citing *Gore*, 517 U.S. at 575) (further citations omitted).

  a. *Reprehensibility*

   The Supreme Court has stated that "reprehensibility" is "perhaps the most

important" factor, and it has identified certain aggravating factors that are associated with

particularly reprehensible conduct, including whether "[1] the harm caused was physical as

opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard

of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the

conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of

intentional malice, trickery, or deceit, or mere accident."  *State Farm Mutual Auto. Ins. Co. v.*

*Campbell*, 538 U.S. 408, 419 (2003).

   Although there was no evidence at trial of any physical contact or threat of

violence, there was evidence that Manzo suffered significant psychological and emotional

distress as a direct result of Matalon's sexually harassing behavior.  During the period of her

employment, Manzo was constantly anxious, "on edge," and fearful.  She lost sleep, lost weight,

felt vulnerable, manipulated and humiliated, and was mentally and physically drained by

Matalon's repeated harassing conduct.  *See* Tr. 218-21.  There was also ample evidence that

Manzo was in a precarious financial situation during the period of the harassment, that Matalon

knew about that situation, and that he used it to his advantage in exerting his power over her.

*See, e.g.*, Tr. 44, 462-63.  Matalon's harassment of Manzo was not an isolated incident, but

rather it began shortly after the start of her employment and continued largely unabated until her

termination.  Finally, as the jury concluded in awarding punitive damages, Matalon's harassment

of Manzo, and Feldman's retaliatory termination, were not mere accidents.  Matalon

intentionally manipulated the terms and conditions of Manzo's employment both to pursue his

goal of a romantic relationship with her and to penalize her when she spurned his advances.  The

evidence also strongly suggested that Feldman's firing of Manzo was an intentional decision to

protect his own financial interests at the expense of Manzo's rights, and that it was done with full

knowledge of the severity of Matalon's conduct.  In these circumstances, a punitive award of

$200,000 is not out of proportion with the reprehensibility of the conduct at issue.

      b.     *Ratio of Punitive to Compensatory Damages*

With regard to the ratio of punitive to compensatory damages, the Supreme Court

has instructed that there must be a reasonable relationship between the two, but that

reasonableness cannot be determined by reference to any "simple mathematical formula."  *Gore*,

517 U.S. at 582.  While a punitive award of more than four times the amount of compensatory

damages has been described as a ratio that "might be close to the line of constitutional

impropriety," *State Farm*, 538 U.S. at 425, the extreme outer limit of an acceptable ratio of

punitive to compensatory damages "may be as high as ten to one."  *Hill*, 212 F. Supp. 2d at 75

(citing *TXO Production Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 458 (1993)).  I conclude that

a 4:1 ratio[6] in this case does not offend due process.  Both federal and New York state cases have

upheld similar or greater ratios.  *See, e.g.*, *Greenbaum*, 67 F. Supp. 2d at 270-72 (collecting

cases); *see also Rosenberg, Minc & Armstrong v. Mallilo & Grossman,* 798 N.Y.S.2d 322, 331

(Sup. Ct. 2005).  I also note that the Supreme Court has consistently recognized throughout its

evolving jurisprudence on punitive damages that "low awards of compensatory damages may

properly support a higher ratio than high awards, if, for example, a particularly egregious act has

resulted in only a small amount of economic damages."  *Gore*, 517 U.S. at 582; *see also State

Farm*, 538 U.S. at 425; *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2622, 2262 (2008).[7]

      c.    *Comparable Civil Penalties and Cases*

      The final *Gore* factor requires consideration of the "the punitive damages award

and the civil or criminal penalties that could be imposed for comparable misconduct."  *Gore*, 517

U.S. at 583.  The maximum damages award available under Title VII varies with the number of

---

[6]     Neither party addresses whether the ratio of punitive to compensatory damages should be calculated by reference to the aggregate amount of punitive damages or with respect to each defendant individually. Since the purposes of such damages include punishing and deterring the individual defendant, I suspect the latter approach is more appropriate, but I need not decide that question here because even a 4:1 ratio would not be excessive.

[7]     Defendants contend that *Exxon Shipping Co. v. Baker* directs that a 1:1 ratio of punitive damages to compensatory damages serves as an "upper limit" in this case.  Defendants' Motion to Set Aside the Punitive Damages Award or For Remittitur ("Def. JNOV Br.") at 13.  I disagree.  That case, addressing the question of whether a $4.5 billion punitive damage award complied with judicially created federal maritime law, held that a ratio of 1:1 is the fair upper limit in maritime tort cases "of reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury."  128 S. Ct. at 2632.  That combination of facts is not present here.

individuals employed by a defendant company.  In the case of a company such as SMC with more than 14 and fewer than 101 employees, 42 U.S.C. § 1981a(b)(3)(a) provides for a maximum award of $50,000.[8]  Those figures do not provide a binding maximum in this case because the NYCHRL does not contain any upper limit on the amount of punitive damages that may be awarded.  *See* N.Y. City Admin. Code § 8-502(a).

The Second Circuit has stated that consideration of awards in comparable cases is also proper.  *See Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).  A review of cases applying both New York and federal law reveals that a punitive damages award of $200,000 is not so outside the range of comparable awards so as to require a remittitur.  While no two cases are exactly alike, comparable damages have been awarded in this district in a number of cases where the nature of the conduct, the number of incidents, and the harm suffered were less severe than in this case.  For instance, in *Ortiz-Del Valle v. National Basketball Association*, 42 F. Supp. 2d 334 (S.D.N.Y. 1999), a jury awarded $7,000,000 in punitive damages to a female referee on her claim that the defendant National Basketball Association had failed to hire her because of her gender.  On defendant's motion for a new trial, the court reduced the punitive damage award through a remittitur to $250,000, finding that an award of that amount would not be excessive.  Similarly, in *Tse*, 568 F. Supp. 2d. at 274, a punitive award of $3,000,000 was reduced to $300,000, a roughly 3:1 ratio to the $101,000 in compensatory damages awarded.  That figure was not considered excessive, despite the explicit finding that the case involved a low degree of reprehensibility.

The bulk of the cases cited by defendants involved less reprehensible conduct

---

[8]        The statute provides for up to $300,000 in damages for the largest employers.  *See* 42 U.S.C. § 1981a(b)(3)(d).

than the defendants' conduct here.[9]  The remaining cases cited do not compel a conclusion that

the damages awarded in this case were unreasonable.[10]

In sum, I conclude that the magnitude of the punitive damages awards did not

violate due process, and was not excessive as a matter of either federal or state law.

B.    Plaintiff's Motion For Attorneys' Fees and Costs

The plaintiff's attorneys, Moskowitz, Book & Walsh, LLP, request the following

relief: (1) prevailing party attorneys' fees in the total sum of $393,842.50; and (2) costs in the

sum of $11,821.39, plus interest.

1.    Standard of Review

In civil rights cases, the court has discretion to award reasonable attorneys' fees

and costs to the "prevailing party."  42 U.S.C. § 2000e-5(k); *see also* 42 U.S.C. § 1988(b).  "The

function of an award of attorneys' fees is to encourage the bringing of meritorious civil rights

claims which might otherwise be abandoned because of the financial imperatives surrounding

the hiring of competent counsel."  *Woodford v. Cmty. Action Agency*, 239 F.3d 517, 525 (2d Cir.

---

[9]    *See* Def. JNOV Br. at 14-15 (citing *Lamberson v. Six West Retail Acquisition, Inc.*, No. 98-CV-8053 (DC), 2002 WL 59424 (S.D.N.Y. Jan. 16, 2002); *Parrish v. Sollecito*, 280 F. Supp. 2d 145 (S.D.N.Y. 2003); *Norris v. N.Y. City Coll. of Tech.*, No. 07-CV-853, 2009 WL 82556 (E.D.N.Y. Jan. 14,2009); *Ettinger v. State Univ. of N.Y. State Coll. of Optometry*, No. 95-CV-9893 (RWS) 1998 WL 91089 (S.D.N.Y. Mar. 2,1998); *Fernandez v. N. Shore Orthopedic Surgery & Sports Med.*, *P.C.*, 79 F. Supp. 2d 197 (E.D.N.Y. 2000), *Rivera v. Baccarat, Inc.*, 10 F. Supp. 2d 318 (S.D.N.Y. 1998); *Kim v. Dial Serv. Int'l, Inc.*, No. 96-CV-3327 (DLC), 1997 WL 458783 (S.D.N.Y. Aug. 11, 1997); *Mahoney v. Canada Dry Bottling Co.*, No. 94-CV-2924 (FB), 1998 WL 231082 (E.D.N.Y. May 7, 1998); and *Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576 (7th Cir. 1996)).

[10]    Defendants cite to *Jowers v. DME Interactive Holdings, Inc.*, No. 00-CV-4753 (LTS), 2006 WL 1408671 (S.D.N.Y. May 22, 2006), but that case is not comparable.  In *Jowers*, punitive damages were constrained by the precarious finances of the defendant, which is not an issue here.  *See Patterson*, 440 F.3d at 122 ("[I]t is the defendant's burden to show that his financial circumstances warrant a limitation of the award.").  In *Hill*, 212 F. Supp. 2d 59, and *Watson v. E.S. Sutton, Inc.*, No. 02-CV-2739 (KMW), 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005), punitive damages were awarded after a remittitur that equaled or exceeded the amount awarded in the instant case. Finally, it is true that *Molina v. J.F.K. Tailor Corp.*, 2004 U.S. Dist. LEXIS 7872 (S.D.N.Y. Apr. 30, 2004), involved significantly more reprehensible conduct than occurred here, yet the damages were lower.  But a court's role is to determine whether the jury's award is "within [a] reasonable range"; it is not to "balance the number of high and low awards and reject the verdict . . . if the number of lower awards is greater."  *Ismail*, 899 F.2d at 187.

2001) (citing *Kerr v. Quinn*, 692 F.2d 875, 877 (2d Cir. 1982)).  A "prevailing party" is one who "succeeds on any significant issue in litigation which achieves some of the benefit the party sought in bringing suit."  *Bridges v. Eastman Kodak Co.*, 102 F.3d 56, 58 (2d Cir. 1996).  The burden is on the party seeking attorneys' fees to submit sufficient evidence to support the hours worked and the rates claimed.  *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

   In determining the amount of attorneys' fees to award, the court must first calculate the "presumptively reasonable fee" – what has historically been referred to as the "lodestar" figure – by multiplying the reasonable number of hours worked by a reasonable hourly rate.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 117-18 (2d Cir. 2007), *amended on other grounds*, 522 F.3d 182 (2d Cir. 2008).  A "reasonable" hourly rate is what a paying client would pay, taking in to account all of the case-specific factors enumerated in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (5th Cir. 1974), including: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."  *Id.* at 114 (citing *Johnson*, 488 F.2d at 717-19).  The actual hours billed may also be adjusted by case-specific factors to yield a reasonable number of hours, including, for example, deductions for "excessive, redundant or otherwise unnecessary hours."  *See Quarantino v.*

*Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).  In sum, the presumptively reasonable fee

"boils down to what a reasonable, paying client would be willing to pay, given that such a party

wishes to spend the minimum necessary to litigate the case effectively."  *Simmons v. N.Y. City*

*Transit Auth.*, 575 F.3d 170 (2d Cir. 2009) (citation and quotation marks omitted).  The

presumptive reasonable fee may also be adjusted upward "in the rare case where the fee

applicant offers specific evidence to show that the quality of service rendered was superior to

that one reasonably should expect in light of the hourly rates charged and that the success was

'exceptional.'"  *Blum*, 465 U.S. at 899.

        The Second Circuit has recently reaffirmed the "forum rule," whereby a district

court will award fees at the going rate in the district in which the court sits unless a reasonable

paying client would pay more to hire an attorney from outside the district.  *See Simmons*, 575

F.3d at 174; *see also Lochren v. County of Suffolk*, 344 Fed. Appx. 706, 708 (2d Cir. 2009).  "In

order to overcome that presumption, a litigant must persuasively establish that a reasonable

client would have selected out-of-district counsel because doing so would likely (not just

possibly) produce a substantially better net result."  *Simmons*, 575 F.3d at 175.[11]

---

[11]        The Second Circuit has suggested that where a client lives outside the forum, a choice of counsel from his or her district of residence would be presumptively reasonable.  *See Simmons* 575 F.3d at 174 ("We presume, however, that a reasonable, paying client would in most cases hire counsel from within his district.") (quoting *Arbor Hill*, 493 F.3d at 119).  Because Manzo does not reside in the Southern District of New York (the district where plaintiff's counsel's office is located), that point does not affect the analysis here.

2.      Application for Attorneys' Fees

a.      Hourly Rates

Plaintiff's counsel asks for an award of fees based on the following hourly rates:

| Name | Position | Requested Hourly Rate | Number of Hours[12] |
|------|----------|----------------------|---------------------|
| Avraham C. Moskowitz | Partner | $600.00 | 124.4 |
| Chaim Book | Partner | $450.00 | 108.2 |
| Jonathan S. Konovitch | Associate | $375.00 | 687.7 |
| M. Todd Parker | Associate | $250.00 | 20.9 |
| Mika Mooney | Associate | $250.00 | 7.6 |
| V. Frosen | Law Graduate | $250.00 | 5.4 |
| Paralegal [name unknown] | Paralegal | $125.00 | 33.2 |

Moskowitz has 30 years of experience and has tried more than 40 cases to verdict.

Book has 19 years of experience and has considerable expertise in labor and employment law.

Konovich has more than 11 years of experience and has tried over 15 cases to verdict.

The rates sought by plaintiff's counsel are somewhat higher than the rates typically granted in fee awards in similar cases in this district.[13]  Plaintiff's counsel point to only

---

[12]     Manzo's moving brief requested $332,045.00 in attorneys' fees for hours billed through January 27, 2010 by Moskowitz (115.8); Book (97.7); Konovitch (554.4); Parker (17.7); Mooney (7.6); Frosen (5.4) and a paralegal (24.2).  Plaintiff's Motion for Attorneys' Fees and Costs ("Pl. Fees Br.") at 4.  The above hourly totals reflect the additional $61,797.50 in fees incurred since January 27, 2010. *See* Pl. Reply Fees Br. at 1 n.1.

[13]     *See, e.g.*, *Olsen v. County of Nassau*, No. 05-CV-3623 (ETB), 2010 WL 376642, at *4-5 (E.D.N.Y. Jan. 26, 2010) (Boyle, Mag. J.) (awarding $375 to $400 per hour to partners, $100 to $250 to associates, and $75 to legal assistants in Title VII case); *Rodriguez v. Pressler & Pressler, LLP*, No. 06-CV-5103, 2009 WL 689056 (E.D.N.Y. Mar. 16, 2009) (Cogan, J.) (awarding $450 per hour to civil rights attorney with 17 years of experience in FDCPA case); *Luca v. County of Nassau*, No. 04-CV-4898, --- F. Supp. 2d ---, 2010 WL 307027 (E.D.N.Y. Jan. 25, 2010) (Block, J.) (awarding $400 per hour where attorney was recognized as an authority in his specialty and had 25 years' experience); *Gutman v. Klein*, No. 03-CV-1570, 2009 WL 3296072, at *2 (E.D.N.Y. 2009) (Cogan, J.) (awarding between $300 and $400 for partners, between $200 and $300 for senior associates, and between to $100 and $200 for junior associates); *Melnick v. Press*, No. 06-CV-6686, 2009 WL 2824586, at *9 (E.D.N.Y. Aug. 28, 2009) (Bianco, J.) (reviewing prevailing rates in district and finding $200-$375 per hour for partners and $100-$295 per hour for associates to be reasonable); *La Barbera v. ESL Home Remodeling Inc.*, No. 06-CV-1372, 2007 WL 708359, at *6 (E.D.N.Y. Feb. 28, 2007) (Ross, J.) (awarding attorneys' fees at rates of $275 per hour for a partner, $150 per hour for associates, and $70 per hour for paralegals in ERISA matter).

a few cases granting hourly fees as high as those requested here.  None is fairly comparable to this case.[14]

> After review of rates awarded in prior cases, the evidence submitted by the parties, and based on my own familiarity with the prevailing rates in the district and my observations of the performance of counsel, I find that the hourly rates requested by plaintiff's counsel should be reduced by 20%.  While the resulting $480 per hour rate awarded for Moskowitz is at the upper end of the range typically awarded in this district, he was brought in to try the case, his trial skills may well be the reason for the favorable jury award, and I conclude that reasonable paying clients would be willing to pay $480 per hour for an attorney of his caliber.

> Accordingly, the following reduced rates will be applied: Moskowitz: $480; Book: $360; Konovitch: $300; Parker: $200; Mooney: $200; Frosen: $100[15]; Paralegal: $100.

> ### b.    Number of Hours Expended

> Plaintiff's counsel requests a fee award reflecting roughly 987 hours, the majority of which were billed by Moskowitz, Book, and Konovich.  The request includes time spent on the present fee application, which is not challenged.  *See Quaratino*, 166 F.3d at 428 (time spent

---

[14]    In *Steinberg v. Nationwide Mutual Ins. Co.*, 612 F. Supp. 2d 219, 222, (E.D.N.Y. 2009), fees were awarded pursuant to a settlement agreement following a decade-long class action, and the attorneys' hourly rates were not contested.  Similarly *Entral Group Int'l v. Sun Sports Bar Inc.*, No. 05-4836 (CBA), 2007 WL 2891419 (E.D.N.Y. Sep. 28, 2007), a default judgment which relied in part on Southern District rates, has been undermined by *Simmons*.  Finally, plaintiff's citation of *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-5328, 2009 WL 3367059 (E.D.N.Y. Oct. 15, 2009) as having awarded attorney rates of $250 to $625 is off the mark both because: 1) that case, a class action of approximately five million merchants resulting in a settlement of $3.05 billion dollars, was different in kind from the case before me; and 2) contrary to plaintiff's assertion, that case rejected counsel's request of rates from $250 to $625 and instead imposed 15% discount to those requested rates.

[15]    Since Frosen has apparently not been admitted to practice, his rates will be further reduced to those of a paralegal, consistent with the general practice in this district.  *See Olsen*, 2010 WL 376642 at *5 n.8.

preparing fee application is generally compensable).

"Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998). If the court determines that the number of hours expended was excessive, redundant or otherwise unnecessary, the court may make reductions to individual entries, or elect to account for such over-billing in an across-the-board percentage deduction. *See Luciano v. Olsten Corp*., 109 F.3d 111, 117 (2d Cir. 1997) (citation omitted).

Defendants contend that an across-the-board reduction of "at least 33%" is warranted because of plaintiff's counsel's use of "block billing, duplicative billing, vague entries, and travel time billed at a full rate rather than the 50% compensable rate." Def. Fees Br. at 12. For instance, defendants point to the following billing entries by Moskowitz as improperly block-billed:

> 6.5 hours for "conference with JSK, ACM, and client, preparing cross examination of Metalon [sic] and Feldman";
>
> 12.0 hours for "Editing cross examinations of all potential witnesses; Editing opening statements; Begin work in summation";
>
> 15.5 hours for "Attendance at trial; roundtrip travel to trial; Preparation for next day of trial."

Defendants also contend that plaintiff's counsel spent excessive time (and utilized an excessive number of attorneys) in tasks such as: opposing defendants' pre-answer motion to dismiss (83.7 hours); opposing defendants' motion for summary judgment (144 hours); preparing for Matalon's deposition (31 hours); preparing for Feldman's deposition (33.5 hours), and preparing for or attending trial (342.9 hours).

Having reviewed plaintiff's counsel's billing records in some detail, I do not consider them to be vague, redundant, or excessive. Though block billing practices can justify a reduction in a fee award if the court is unable to determine the reasonableness of the hours expended, *see Gutman*, 2009 WL 3296072 at *8; *see also Hensley*, 461 U.S. at 437 n.12 ("Plaintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures."), plaintiff's counsel's time entries are not so vague as to frustrate such review.

Finally, I am not persuaded by the defendants' claim that a reduction is warranted to account for the time spent litigating unsuccessful claims. It is true that Manzo's complaint included a claim that defendants had failed to pay her overtime compensation and certain earned commissions and bonuses, in violation of federal and state law. *See* Complaint ¶¶ 29-47. And Manzo conceded an inability to prove those claims during the briefing of the defendants' motion for summary judgment. But Manzo's wage and hour claims were intimately related to the sexual harassment and retaliation claims she proved at trial. Specifically, she proved that Matalon manipulated her employment at SMC in order to ensure that he had personal control over her bonus and commissions, and that he threatened to – and on one occasion did – withhold a promised bonus because she had rebuffed his advances. These facts served as direct evidence of Manzo's successful claim of discrimination. Also, evidence of Manzo's hours, salary arrangement and bonuses (or lack thereof) was relevant to the calculation of her compensatory damages and her rebuttal of defendants' claims that she was fired for

poor performance.  While the defendants correctly note that "no fees should be awarded for time spent pursuing a failed claim if it was unrelated to the plaintiff's successful claims," *Leblanc v. Fletcher*, 143, F3d. 748, 762 (2d Cir. 1998), Manzo's wage and hour claims and her claims of discrimination and retaliation all "involve[d] a common core of facts," and accordingly a reduction in the fee award is not appropriate based on the (comparatively little) time spent on the wage and hour claims.[16]

In sum, I find the number of hours for which plaintiff's counsel request an award to be reasonable.  Using the reduced hourly rates discussed above, plaintiff's fee request is granted in the sum of $314,534.00.

3.     Application for Costs

In addition to attorneys' fees, Manzo seeks to recover costs in the sum of $11,94139, plus interest.  Her entitlement to costs derives from two sources.  Pursuant to Fed. R. Civ. P. 54(d)(1), "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."  *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98, 100 (2d Cir. 2006) (citing Fed. R. Civ. P. 54(d)(1)).  The costs that a party may recover under Fed. R. Civ. P. 54(d) are strictly limited to those listed in 28 U.S.C. § 1920.[17]  *Zerega Ave. Realty Corp.*

---

[16]     Defendants also contend that a reduction is warranted because Manzo prevailed on her discrimination claim against Matalon (but not Feldman) and prevailed on her retaliation claim against Feldman (but not Matalon).  In light of plaintiff's considerable level of success on each claim, no reduction in fees is warranted.  *See Hensley*, 461 U.S. at 435-36 ( "[w]here a plaintiff has obtained excellent results, [her] attorney should recover a fully compensatory fee," even if the plaintiff did not "prevail on every contention raised in the lawsuit.").

[17]  28 U.S.C.A. § 1920 provides:

A judge or clerk of any court of the United States may tax as costs the following:
(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

*v. Hornbeck Offshore Transp., LLC*., No. 04-CV-9651 (KNF), 2007 WL 4326110, at *2 (S.D.N.Y. Dec. 4, 2007) ("a district court does not have discretion, under Fed. R. Civ. P. 54(d), to tax as costs expenses incurred beyond those specified as taxable by Congress in 28 U.S.C. § 1920."). Manzo may also recover costs under 42 U.S.C. § 2000e-5(k), which has been interpreted as allowing for the recovery of "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients," even when such disbursements fall outside of 28 U.S.C. § 1920. *Mugavero v. Arms Acres, Inc.*, No. 03-CV-05724 (PGG), 2010 WL 451045, at *12 (S.D.N.Y. Feb. 9, 2010) (citation omitted). Reimbursement is not permitted, however, for items that constitute routine office overhead. *See LeBlanc-Sternberg*, 143 F.3d at 763.

Defendants have separately moved for costs under both of the above statutory provisions. Although a request to tax costs under 28 U.S.C. § 1920 is properly addressed in the first instance to the Clerk of Court rather than to the district court pursuant to Local Rule 54.1, I will overlook the plaintiff's procedural error. *See Gala Jewelry, Inc. v. Harring*, No. 05-CV-7713, 2007 WL 684002, *1 (S.D.N.Y. Mar. 1, 2007) ("[T]he procedure [of filing a request for costs with the Clerk of Court] is permissive, and the failure to follow it does not deprive the Court of power to tax costs.").

Defendants object to the following costs as not recoverable under 28 U.S.C. § 1920: the premium paid for daily copies of the trial transcript, the costs of the deposition transcripts of Angela Zirpoli, Carol Battaglia and Doreen Van Etten, and certain incidental costs associated with those deposition transcripts including attendance fees, delivery charges, and fees

---

(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

for the creation of compact discs. The objection misapprehends the legal provisions explained above governing costs, for the fee shifting provisions of 42 U.S.C. § 2000e-5(k) allow plaintiffs to recover most of the costs ordinarily incurred involved in litigating a case, irrespective of whether they are recoverable under 28 U.S.C. § 1920. *See Anderson v. City of New York*, 132 F. Supp. 2d 239, 245 (S.D.N.Y. 2001) (costs pursuant to an attorneys' fee award "include not only those costs ordinarily taxable pursuant to 28 U.S.C. § 1920, as implemented by Fed. R. Civ. P. 54(d)(1) and Local Rule 54.1, but also those reasonable costs that are ordinarily charged to clients in the legal marketplace."); *see also Morgenstern v. County of Nassau*, No. 04-CV-58 (ARL) 2009 WL 5103158, at *12 (E.D.N.Y. Dec. 15, 2009) ("expenditures for filing fees, process servers, subpoena/witness fees, transcripts, printing and photocopying, messenger services, and postage . . . travel, transportation and meals are [] routinely recoverable. . . ."). These disputed costs are commonly charged to paying clients and were reasonably incurred in this case and are therefore compensable pursuant to 42 U.S.C. § 2000e-5(k).[18] *Compare Robinson v. City of New York*, No. 05-CV-9545(GEL), 2009 WL 3109846, at *12 (S.D.N.Y. Sept. 29, 2009) (awarding premium cost of daily transcripts to prevailing Title VII plaintiff), *with Malloy v. City of New York*, No. 98-CV-5823 (JG), 2000 WL 863464, at *1 (E.D.N.Y. June 23, 2000) (denying premium cost of daily transcripts in requests to tax costs pursuant to 28 U.S.C. § 1920).

---

[18]     The cost of Zirpoli, Battaglia and Van Etten's depositions are also recoverable under 28 U.S.C. § 1920. While defendants are correct that the cost of a deposition and one copy is taxable as a cost under Local Civ. R. 54.1(c)(2) only "if the deposition was used or received in evidence at the trial," "[t]he plain language of [Local Rule 54.1]. . . suggests the word "use" extends well beyond explicit reliance on the deposition." *Whitfield v. Scully*, 241 F.3d 264, 271 (2d Cir. 2001). Each of the six depositions falls within the broad meaning of the word "use," and is taxable as a cost. *See Cush-Crawford v Adchem Corp.*, 94 F. Supp. 2d 294, 303 (E.D.N.Y. 2000) (concluding that to be taxable, it suffices that at the time the deposition was taken, it was reasonably expected that the transcript would be used for trial preparation).

Defendants object to a lack of supporting documentation for the remaining costs, totaling $1,331.70, which are comprised primarily of expenses for duplicating, courier services, electronic research, postage, faxing, and subway travel.  Def. Fees Br. at 19-22.  While more documentation would have been preferable, the claimed expenses are plainly not excessive in the context of this case.  *See Tatum v. City of New York*, No. 06-CV-4290 (PGG), 2010 WL 334975 (S.D.N.Y. Jan 28, 2010) (awarding duplicating costs which "appear[ed] reasonable" despite absence of full documentation).  However, plaintiff's itemized list of costs includes a charge for "trial binders, exhibits, and tabs," ($30.00), an expense that is considered non-compensable general office overhead.  *See id.*  With the exception of that $30.00 charge, which has been deducted, plaintiff's request for costs is granted in the amount of $11,911.39.

    4.    <u>Interest</u>

Under 28 U.S.C. § 1961(a), a plaintiff is entitled to post-judgment interest on "any money judgment in a civil case recovered in a district court."  The rate of post-judgment interest is governed by 28 U.S.C. § 1961(a) & (b), which direct that interest be calculated from the date judgment is entered, at a rate equal to the weekly average 1-year constant maturity Treasury yield, compounded annually.

In addition, as the Second Circuit has made clear, where "damages awarded to the plaintiff [in a Title VII action] represent compensation for lost wages, 'it is ordinarily an abuse of discretion not to include pre-judgment interest."  *Gierlinger v. Gleason*, 160 F.3d 858, 873-74 (2d Cir. 1998).  No federal statute specifies the rate at which pre-judgment interest

24

should be calculated,[19] and courts in this district have utilized a number of different rates.  *See*

*Hollie v. Korean Air Lines Co., Ltd.*, 834 F. Supp. 65, 69 (S.D.N.Y. 1993) (citing cases applying

various rates).  Most commonly, courts have borrowed the statutory post-judgment interest rate

specified in 28 U.S.C. § 1961(a) in order to calculate prejudgment interest.  *See Cioffi v. N.Y.*

*Cmty. Bank*, 465 F. Supp. 2d 202, 222 (E.D.N.Y. 2006) ("In cases where the judgment is based

on violations of both state and federal law, it is common practice in the Second Circuit to apply

the federal interest rate pursuant to 28 U.S.C. § 1961(a).").  However, I retain discretion to award

pre-judgment interest at a higher rate, a lower rate, or to deny pre-judgment interest entirely

upon consideration of "(I) the need to fully compensate the wronged party for actual damages

suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial

purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant

by the court."  *Gierlinger*, 160 F.3d at 873.  Here, computation of pre-judgment interest at the

adjusted prime rate provided in 26 U.S.C. § 6621, rather than the slightly lower federal post-

judgment interest rate, is warranted by the remedial purpose of Title VII, the reprehensibility of

defendants' conduct, and the fact that Manzo's unlawful termination led her to take out a bank

loan in an effort to secure self-employment.[20]  *See E.E.O.C. v. Erie County*, 751 F.2d 79, 82 (2d

Cir. 1984) (finding no error in district court's use of adjusted prime rate to calculate prejudgment

---

[19]      Had the jury distinguished in its award of damages between Manzo's federal and state claims,
New York's Civil Practice Law and Rules ("CPLR"), would require that interest on Manzo's state claims be
awarded at a 9% annual rate.  *See* CPLR §§ 5001, 5004; *see also Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir.
2008) (state law governs pre-judgment interest on award for state claim).  However, the New York statutory rate
does not control where a judgment is awarded on mixed federal and state claims.  *See Cioffi*, 465 F. Supp. 2d at 222.

[20]      "The adjusted prime rate, established periodically by the Secretary of the Treasury, is equivalent to
the average predominant prime rate quoted by commercial banks to large businesses, as determined by the Board of
Governors of the Federal Reserve System.  It is the rate to be paid by taxpayers on tax deficiencies, and by the
government on tax overpayments."  *Erie County*, 751 F.2d at 82 (citation and quotation marks omitted).

interest in discrimination case); *see also E.E.O.C. v. O'Grady*, 857 F.2d 383, 391 (7th Cir. 1988) (adjusted prime rate was a reasonable approximation of the time value of money where plaintiffs "had probably been forced to borrow money once they were deprived of their wages.").

From July 7, 2007 (the date of Manzo's termination) through the present, the rate embodied in 26 U.S.C. § 6621(a)(2) fluctuated from a low of 4 percent per annum to a high of 8 percent, averaging approximately 5.55 percent per annum.  See Rev. Rul. 2009-37, Nov. 23, 2009, available at 2009 WL 4023061 (listing quarterly non-corporate tax underpayment interest rates).  Applying that rate beginning on December 1, 2008, which is roughly the midpoint between plaintiff's termination and the date of this opinion,[21] and compounding annually, yields $4,219.73 in prejudgment interest.

Plaintiff also seeks interest on the costs award.  An award of interest on costs is appropriate "since counsel have been out-of-pocket for those costs for a substantial period of time." *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 548 (S.D.N.Y. 2008).  Accordingly, interest on the costs award is granted at the rate specified in 28 U.S.C. § 1961(a), computed from the midpoint date of December 1, 2008.[22]

---

[21]    "Where prejudgment interest is given, it should be assessed upon damages only as they become due." *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 84 (2d Cir. 1994).  Utilizing the midpoint date is a practical method of accounting for the fact that Manzo's damages accrued over a period of time while "avoiding the need for numerous calculations establishing a separate interest figure for each lost monthly payment." *Id*; *see also Hill*, 2003 WL 366641, at *1 n.2.

[22]    Plaintiff's counsel do not request any specific rate of interest on the costs incurred.  I am aware of no case awarding interest on costs at a rate higher than the federal statutory post-judgment interest rate.  Awarding costs at that rate (rather than higher adjusted prime rate used to calculate prejudgment interest on compensatory damages in this case) is sensible because unlike a compensatory damage award, the costs of litigation are an anticipated business expense advanced by a law office, which were not withheld through malice, and which defendants did not retain control over during the pendency of the litigation.  *See, e.g.*, *Tatum*, 2010 WL 334975, at *14 (awarding interest on costs at the rate provided in 28 U.S.C. § 1961(a)).

CONCLUSION

For the reasons set forth above, defendants' motion to vacate the award of punitive damages or grant a new trial or a remittitur is denied.  Plaintiff's motion for attorneys' fees is granted in the amount of $314,534.00, and plaintiff's motion for costs is granted in the amount of $11,911.39.  Pre-judgment interest on the compensatory portion of plaintiff's award is granted in the amount of $4,219.73.  Post-judgment interest, to be calculated by the Clerk of Court, is granted on the compensatory damages portion of plaintiff's award at a rate equal to the weekly average 1-year constant maturity Treasury yield in accordance with 28 U.S.C. § 1961(a).  Interest on the costs of litigation, to be calculated by the Clerk of Court, is granted at that same rate for the period beginning December 1, 2008.

So ordered.

John Gleeson, U.S.D.J.

Dated:          May 11, 2010
                Brooklyn, New York

27